Filed:  March 14, 2005

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 97-4811(L)
(CR-97-40008-R)

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

VICTOR JERMAINE LIPFORD,

Defendant - Appellant.

O R D E R

The court amends its opinion filed February 7, 2000, as follows:

On page 4, Section A, second paragraph, line 4 -- substitute the name "Cunningham" for the name "Lipford."

For the Court

/s/ Patricia S. Connor

_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 97-4811

VICTOR JERMAINE LIPFORD,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                              No. 97-4838

VICTOR JERMAINE LIPFORD,
Defendant-Appellee.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                               No. 97-4855

MARLOWE ANDRE FARMER, a/k/a
Andre Womack, a/k/a Dred,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                               No. 98-4716

CHRISTOPHER LEE WOMACK, a/k/a
Chris,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CR-97-40008-R)

Argued: October 29, 1999

Decided: February 7, 2000

Before MOTZ, TRAXLER, and KING, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Thomas Hilton Johnson, Jr., GRAY, NEWELL & JOHNSON, Greensboro, North Carolina, for Appellants. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Walter T. Johnson, Jr., Greensboro, North Carolina, for Appellant Womack; Rickey G. Young, LAW OFFICE OF RICKEY G. YOUNG, Martinsville, Virginia, for Appellant Farmer. Robert P. Crouch, Jr., United States Attorney, Donald L. Wolthius, Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

KING, Circuit Judge:

We consider here the consolidated appeals of Victor J. Lipford, Marlowe A. Farmer, and Christopher L. Womack, each of whom was convicted on drug-related charges following a joint trial in the West-

2

ern District of Virginia. The parties have raised numerous assertions of error on appeal. However, we hold that only one aspect of the district court's proceedings -- the judgment of acquittal on Lipford's conviction under 18 U.S.C. § 924(c)(1) -- requires reversal, a holding that also mandates that Lipford be resentenced. We reject the remaining claims of error, and we affirm the district court in all other respects.

I.

Beginning no later than the fall of 1995 and continuing through January 1997, Lipford, Farmer, and Womack (collectively, "the appellants") were members of a drug trafficking organization that distributed cocaine from two trailer homes in Pittsylvania County, Virginia. At the first trailer home, in the Malmaison section of Danville, the appellants sold cocaine themselves and distributed cocaine through several street dealers, including Clifton Powell, Anthony Hood, Lamont Hood, Thomas Wiles, Roy Hood, and Tony Kirby. The second trailer home, Farmer's residence at 321 Moffett Street in Danville, also served as an outlet for the organization's drug activities. Farmer sold cocaine from his Moffett Street residence, as did Christopher Womack; the pair were assisted by Roy and Reginald ("Reggie") Womack.

On January 21, 1997, a grand jury in the Western District of Virginia returned a forty-five count indictment against the appellants and others.[1] Following a two-week jury trial in June 1997, the appellants were each convicted of participating in a drug conspiracy, in violation of 21 U.S.C. § 846. In addition, Farmer was convicted on two counts of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Lipford was convicted on five counts of posses-

_____

[1] The indictment charged several co-defendants, including Reggie Womack, Roy Womack, Gary Elmore, Anthony Hood, Lamont Hood, Roy Hood, Tony Kirby, Richard Logan, Clifton Powell, Marcelous Stone, Thomas Wiles, and "Fnu Lnu" (an acronym for "First Name Unknown, Last Name Unknown," commonly used to refer to "John Doe" defendants). Most of the other defendants pleaded guilty on selected counts, but Reggie Womack, Roy Womack, and Fnu Lnu were fugitives as of the date the appellants were sentenced.

sion with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and one count of violating 18 U.S.C. § 924(c)(1) -- carrying a firearm during and in relation to a drug trafficking offense. Following the verdict, the trial court granted Lipford's motion for judgment of acquittal on the firearm conviction.

A.

Lipford's firearm conviction under 18 U.S.C. § 924(c)(1) was based upon a series of transactions with a government informant, Larry Cunningham, and we summarize below the evidence relevant to that conviction. On May 22, 1996, Cunningham, acting at the direction of law enforcement officials,[2] contacted Lipford by phone, made arrangements to purchase a quantity of drugs, and then drove to Malmaison to complete the transaction with Lipford. As they were conducting the drug deal, Lipford asked Cunningham whether he knew anybody who wanted to purchase a firearm --"[a] .25 automatic." J.A. 853. Cunningham responded that he did know of someone (himself), but that he was not in a position to buy a firearm that day. Id. Cunningham then bought ten grams of cocaine base ("crack") from Lipford, leaving open the possibility of other drug and firearms deals with him in the future.

The next day, May 23, 1996, Cunningham -- again acting at the behest of law enforcement officials -- drove to Lipford's trailer intending to purchase both crack cocaine and the .25 caliber pistol they had discussed the day before. The DEA supplied Cunningham with $650 in cash to purchase drugs, and ATF provided $200 to purchase the firearm. Cunningham bought eleven grams of crack cocaine from Lipford for $700. Although Lipford and Cunningham discussed the .25 caliber pistol during the transaction, Cunningham did not purchase the firearm at that time and returned $150 in cash to the police.

_____

[2] Cunningham was compensated by, inter alia, the Drug Enforcement Administration ("DEA"), the Bureau of Alcohol, Tobacco and Firearms ("ATF"), the Pittsylvania County Sheriff's Office ("county sheriff's office"), and the Danville Police Department ("Danville police"). We refer to representatives of these organizations collectively as "law enforcement officials." Each of these law enforcement organizations, at various times, also funded Cunningham's purchases of contraband.

In the days following that transaction -- between May 23, 1996 and May 31, 1996 -- Cunningham attempted to arrange another deal with Lipford. Cunningham spoke to Lipford by phone several times about purchasing both drugs and the .25 caliber pistol, and they ultimately agreed to meet on May 31, 1996, to complete the drug and firearm transactions.

On May 31, 1996, Cunningham was issued $650 in cash from the DEA for the purchase of drugs and $140 from the county sheriff's office for the purchase of a firearm. Cunningham then drove to the Malmaison area, met Lipford, and purchased both crack and the .25 caliber "Raven" pistol from Lipford. Lipford first handed Cunningham the handgun, then gave him thirteen and one-half grams of crack. Thereafter, Cunningham passed Lipford $750, then paid Lipford the remaining $40, the balance due for the firearm. [3]

After the Government presented this evidence at trial, the district court charged the jury, without objection, on the "in relation to" requirement:

> The government is required to prove that the defendant actively employed the weapon or that it was carried during and in relation to the drug offense charged.
>
> * * *
>
> However, you must be convinced beyond a reasonable doubt that the firearm played a role in or facilitated the commission of the drug offense. In other words, you must find the firearm was an integral part of the offense charged, the offense which is alleged in count forty-one. [4]

_____

[3] These payments represented the $690 cost of the crack and the $100 cost of the .25 caliber pistol.

[4] Count forty-one charged Lipford and Reggie Womack of possession with intent to distribute (or distribution) of crack on May 31, 1996 -- the transaction with Cunningham discussed supra at 5. The jury also convicted Lipford on this count.

5

J.A. 1866. Based on the evidence and the instructions, the jury convicted Lipford on count forty-two of the indictment, the § 924(c)(1) charge for carrying a firearm on May 31, 1996, during and in relation to a drug trafficking crime.

B.

On November 21, 1996, when police officers executed a search warrant at 321 Moffett Street ("Farmer's home"), Farmer fired shots at the officers, hitting one of them. The district court ultimately admitted evidence of this shooting at trial (collectively the "shooting evidence"), and because this evidentiary ruling forms the basis of several assertions of error on appeal, we summarize the trial court proceedings relating to the admission of the shooting evidence.

Before trial, Farmer moved in limine to exclude any evidence of this shooting; in response, the Government sought to demonstrate the relevance of the shooting evidence prior to its introduction at trial. However, when the Government initially attempted to explain the relevance of the shooting evidence,[5] the district court determined that the Government had failed to articulate a sufficient nexus between the drug violations and the shooting. Therefore, the court initially granted Farmer's motion in limine, characterizing Farmer's actions as the "simple act of shooting a police officer" with no connection to the drug trafficking conspiracy. The court also observed that any collateral relevance of the evidence was outweighed by its potential to be improperly prejudicial.

Immediately after the court related its initial decision from the bench, and before the court proceeded to the next pre-trial issue at the hearing, the Government sought permission to supplement the record with respect to the relevance of the shooting evidence. The Government then asserted that it had a witness who, while waiting to purchase cocaine a few days before the shooting of the police officer, overheard Farmer and co-defendant Roy Womack agree that if police

_____

**5** The Government contended that drug transactions had taken place in Farmer's home, that the shooting was within the time frame covered by the conspiracy, and that the shooting was an overt act in furtherance of the conspiracy.

6

raided the house, Farmer and Womack would shoot the officers. Based on this representation, the court withdrew its initial ruling, instructed the Government not to mention the shooting evidence during its opening statement to the jury, and advised the parties that it would hear from the Government's witness before ruling on this issue.

The next morning, outside the presence of the jury, the Government presented the testimony of witness Terence Burton on the issue raised by the motion in limine. Burton testified that, around the middle of September 1996 (before the shooting on November 21, 1996), he went to Farmer's home to purchase drugs from Roy Womack. On that occasion, Womack wanted $200 for seven grams of crack, but Burton only carried $195. When Womack refused to sell at the lower price, Burton asked to speak with Farmer, who agreed to sell the crack for $195. Womack subsequently left the room to retrieve the drugs, and when he returned, Farmer asked why Womack had to leave the room. Womack replied that he was trying to be careful (by keeping the drugs in another room) and that a "bust" could come at any time. Womack added that if a bust "came down," they (Roy Womack and Farmer) had to be prepared to "take`em out, whoever it is." J.A. 241. Farmer replied, "Yeah, that's what it be; that's the way it'll be." J.A. 242.

After hearing and considering Burton's testimony, the court found the required nexus between the shooting of the police officer and the drug conspiracy. The court ruled that statements by Womack and Farmer about "tak[ing] `em out," and the evidence of the shooting of the police officer during execution of the search warrant at Farmer's home, were admissible to prove the existence and scope of the drug conspiracy. The court accordingly denied Farmer's motion in limine to exclude the shooting evidence.**6**

_____

**6** Burton's testimony before the jury was arguably at minor variance with his earlier testimony:

> Q: [W]ould you please tell the jury what it was that you heard [Roy Womack and Farmer] say during this conversation?
>
> Burton: Well, I heard, Roy was saying that if anything hopped off or came off about coming in or something going down, that they had too much to lose; they couldn't

7

C.

Following the guilty verdicts, and after the district court's entry of judgment of acquittal on Lipford's § 924(c)(1) conviction, the court sentenced Farmer to life imprisonment, Womack to 240 months of imprisonment, and Lipford to 168 months of imprisonment. Each of the appellants appeals his convictions and sentences, and the Government cross-appeals the judgment of acquittal entered on Lipford's § 924(c)(1) conviction. We possess jurisdiction under 21 U.S.C. § 1291 and 18 U.S.C. § 3731. See United States v. Mitchell, 177 F.3d 236, 238 (4th Cir. 1999) ("[A]ppeals by the Government from . . . judgments of acquittal are authorized by § 3731") (quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 568 (1977)).

II.

We review de novo the district court's entry of a judgment of acquittal. United States v. Harris, 31 F.3d 153, 156 (4th Cir. 1994). In reviewing that judgment, we must determine whether the evidence, viewed in the light most favorable to the Government, could have permitted a rational jury to convict the defendant on that charge. Id.

In this case, the jury convicted Lipford on the firearm charge under 18 U.S.C. § 924(c)(1), which required that the Government prove: (1) Lipford used or carried a firearm (2) during and in relation to (3) a drug trafficking offense. Only the "in relation to" requirement is contested on appeal, because it was that requirement that the district court found unfulfilled in entering the judgment of acquittal. Relying upon United States v. Wilson, 115 F.3d 1185 (4th Cir. 1997), a decision premised upon facts distinguishable from those before us here, the

_____

afford to take a loss.

* * *

That's when Andre [Farmer] said, he agreed, and he said, "Yeah, we sure couldn't, and if anything hopped off, we'd do what we had to do, take the [expletive deleted] out if necessary, regardless of whoever it is."

J.A. 1239-40.

8

district court found the "in relation to" requirement lacking, determining that: (1) the sale of the firearm was an independent transaction coincidentally occurring at the same time as the drug offense; and (2) the sale of the firearm did not facilitate the drug transaction.

To meet the "in relation to" requirement, the Government must prove that the firearm has "some purpose or effect with respect to the drug trafficking crime[.] . . . [T]he gun at least must `facilitate or have the potential of facilitating,' the drug trafficking offense." Smith v. United States, 508 U.S. 223, 237 (1993) (quoting United States v. Stewart, 779 F.2d 538, 540 (9th Cir. 1985)). On one hand, the presence of the firearm cannot be "the result of accident or coincidence." United States v. Mitchell, 104 F.3d 649, 654 (4th Cir. 1997) (quoting Smith, 508 U.S. at 238). On the other hand, it is enough for § 924(c)(1) purposes if the firearm was present for protection or to embolden the actor. Mitchell, 104 F.3d at 654.

In a similar vein, cases have liberally construed the "in relation to" requirement, though mandating that the presence of the firearm cannot be spontaneous or coincidental. For example, in United States v. Molina, 102 F.3d 928 (7th Cir. 1996), the Seventh Circuit affirmed a conviction under § 924(c)(1) where the only evidence supporting the "in relation to" requirement was that the police found drugs and a firearm in the same compartment. In so holding, the court noted:

> In establishing whether a gun, found to have been carried, was carried in relation to a drug trafficking crime, if the drugs and gun are together in the same place it is nearly an inescapable conclusion that they satisfy the in relation to prong of § 924(c)(1). The relation between the firearm and the drugs -- which is, after all, the core of the offense -- is best established by their relation to each other, and not by the distance between owner and gun at the moment of arrest.

Id. at 932 (emphasis in original). Similarly, in United States v. Turner, 157 F.3d 552 (8th Cir. 1998), the court affirmed a § 924(c)(1) conviction where the police officers stopped the defendant in his car and found a pistol, a loaded pistol clip, and drugs, all inside a bag on the passenger side of the vehicle. Based on the position of the pistol directly next to the drugs, and that a loaded pistol clip was also in the

9

same bag, the Eighth Circuit held that a jury could have inferred that "the gun served to facilitate the [drug trafficking offense] by protecting not only [the defendant], but also the drugs," thereby satisfying the "in relation to" requirement. Id. at 556. These cases illustrate the broad construction that has been afforded the "in relation to" requirement.

The Government asserts that the presence of the handgun here had at least the potential to facilitate the drug transaction between Lipford and Cunningham, and that the judgment of acquittal should therefore be reversed. Put simply, the Government claims that the sale of a firearm by a drug dealer always has the potential to facilitate the sale of drugs because a buyer might be more apt to purchase drugs from a drug source if he knows that he can also obtain a firearm from that source. The Government further argues that it is irrelevant whether Cunningham was actually influenced to purchase drugs by the option also to purchase the .25 caliber pistol, because here the potential to influence drug sales existed.

We agree that the judgment of acquittal must be reversed, but we base our decision on a rationale slightly different than that asserted by the Government. We recognize that, in the nebulous drug trade underworld, the line between purchaser and salesman is often blurred; in other words, a purchaser must often sell himself as a good customer to convince a drug source to take the risk of selling drugs. In order to persuade a drug source into taking that risk, a drug purchaser can often "sweeten the pot," offering to purchase not only drugs, but other illegal goods as well. Where that other illegal good is a firearm, that gun's involvement in the drug transaction is not "spontaneous" or "co-incidental;" on the contrary, the firearm facilitates the drug transaction, making it possible for the drug buyer to get the drug seller to take the risks inherent in selling contraband.

We are confident that a rational jury presented with the evidence here could have properly concluded that Lipford's participation in the May 31, 1996, drug transaction was facilitated by the firearm transaction. Before the May 31, 1996 transactions, there were extended negotiations between Cunningham and Lipford during which the sale of drugs was consistently tied to the sale of a firearm. Lipford was the first to suggest a firearms deal at their meeting on May 22, 1996, and,

10

significantly, Lipford made this offer before Cunningham bought drugs directly from him. To this offer, Cunningham responded that he would be interested in purchasing both drugs and a firearm sometime in the future; then, at their next meeting, on May 23, Cunningham made clear that he intended to purchase a firearm at some point. In the negotiations leading to the crucial drug and firearm transactions on May 31, Cunningham repeatedly requested that Lipford sell him both drugs and a firearm, and Lipford ultimately did just that. Under these circumstances, we conclude that the handgun in question had at least the potential of attracting Lipford into making the sale of drugs. This is a circumstance sufficient to meet the "in relation to" requirement of the § 924(c)(1) charge.

In so holding, we recognize and reaffirm that there may be circumstances in which the possession of a firearm during a drug transaction can indeed be coincidental -- thus failing to meet the "in relation to" requirement. See Wilson, 115 F.3d at 1185. In Wilson, a government informant went to a drug source with the specific intent of purchasing marijuana, and the drug source offered to sell him "as much marijuana as he needed." Id. at 1191. However, during the negotiations over the sale of drugs, the drug source spontaneously removed an unloaded rifle from a box in his closet and offered to sell it to the informant. Id. The informant then chose to purchase the rifle, but not the drugs. In that case, the firearm did not enter the picture until the last moment, and there was no evidence that the presence of the rifle influenced either the drug source or the buyer. Based on those facts, we found that the "sale of the firearm neither facilitated nor had the potential of facilitating [the] marijuana sales[,]" and because the sale of the firearm was "a completely independent, yet contemporaneous action[,]" we held that the district court had erred in denying the defendant's motion for judgment of acquittal. Id. at 1191-92.

However, the facts in Wilson stand in contrast to those here.[7]

_____

[7] Significantly, the firearm at issue in Wilson was a long gun, a rifle, which is more of a sport firearm than is a handgun. By contrast, the firearm here was a .25 caliber pistol, i.e., a small, easily concealable handgun. When a gun is involved in criminal activity, it is far more likely to be a handgun than a rifle. See, e.g. , Department of Justice, Bureau of Jus-

11

Among other things, in this case, each conversation between Lipford and Cunningham leading to the drug transaction on May 31, 1996, concerned the sale of both drugs and firearms. In this context, the gun transaction had at least the potential of attracting Lipford into selling drugs, and we believe that the jury could have rationally determined that the firearm had at least the potential of facilitating the drug transaction at issue.**8** We therefore reverse the district court's judgment of acquittal on Farmer's conviction under 18 U.S.C. § 924(c)(1).

III.

Each appellant challenges the guilt phase proceedings, and they raise a number of different arguments in this respect. We review their arguments in turn.

A.

The appellants each claim reversible error in the admission of the evidence concerning the shooting of the police officer on November

_____

tice Statistics, Selected Findings, Firearms, crime, and criminal justice: Guns Used in Crime, at 2 (July 1995) ("Of all firearm-related crime reported to the survey, 86% involved handguns. The FBI's Supplemental Homicide Reports show that 57% of all murders in 1993 were committed with handguns, 3% with rifles, 5% with shotguns, and 5% with firearms where the type was unknown."). In addition, during the discussion about drugs, the drug dealer in Wilson had the rifle stored in a box inside his closet, while, in this case, Lipford actually carried the handgun during the drug transaction. These facts -- the type and location of the firearm -- also distinguish Wilson from this case: It is more likely that the handgun here would be carried "in relation to" the drug transaction than the rifle in Wilson.

**8** Although we reverse, we note our rejection of the Government's argument on this issue. While a jury could find the firearm sale potentially facilitated Lipford's participation in the drug sale, it could not have rationally found that the firearm transaction had the potential to facilitate Cunningham's participation in the drug transaction. Cunningham, the drug buyer, was a government agent who had been directed to purchase drugs from Lipford. Put simply, Cunningham would have purchased drugs from Lipford regardless of whether Lipford sold firearms.

12

21, 1996. Because the appellants properly preserved this assertion of error, we review the district court's admission of the shooting evidence for an abuse of discretion. See United States v. Lowe, 65 F.3d 1137, 1145 (4th Cir. 1995).

The appellants' first contention is that Federal Rule of Evidence 404(b) mandated exclusion of the shooting evidence. However, we have previously held that "Rule 404(b) applies only to limits on the admission of other acts extrinsic to the one charged." United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996). Thus,"where testimony is admitted as to acts intrinsic to the crime charged, and is not admitted solely to demonstrate bad character, it is admissible." Id. at 88.

The appellants characterize the evidence as "extraneous" to the crimes charged. We disagree. "Other criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." Id. (quotation omitted). The shooting evidence falls squarely within our definition of "intrinsic acts." Burton's testimony revealed that Farmer had agreed to defend the conspiracy's supply of drugs by shooting at officers who raided his home, and he did just that when the police executed the warrant. The shooting evidence also corroborated other evidence establishing that Farmer was involved in a drug conspiracy with Roy Womack, and it served to complete the story with respect to the scope of the drug conspiracy. Because this evidence was intrinsic to at least the drug conspiracy charge, Rule 404(b)'s limitation does not apply to it.

In the alternative, the appellants assert that the shooting evidence should have been excluded under Federal Rule of Evidence 403. They claim that the probative value of the shooting evidence was substantially outweighed by the danger of unfair prejudice. The unfair prejudice they claim is that the jury might have convicted the appellants for the drug offenses solely because one of them was involved in the shooting of a police officer.

While there is no doubt that the shooting evidence was highly incriminating, being prejudicial in this manner is not unfair. When Farmer agreed that he would shoot police officers attempting to raid his drug enclave, he demonstrated the extent to which he would

13

defend this drug conspiracy, and the statement that Farmer would "take-out" anyone who would bust them clearly linked the police shooting to the drug conspiracy. In addition, Burton's testimony demonstrated that Roy Womack and Farmer furthered the conspiracy by agreeing upon a unified response in the event of a raid. This evidence was thus highly relevant in demonstrating the scope of the conspiracy, and under the circumstances, the shooting evidence was appropriately prejudicial. Therefore, the district court did not abuse its discretion by concluding that the probative value of the shooting evidence was not substantially outweighed by the danger of unfair prejudice.

Finally, Womack and Lipford claim that the shooting evidence should not have been admitted against them because they did not participate in the actual shooting of the police officer. However, the evidence at trial established that these defendants were both involved in the drug trafficking conspiracy, and there was no evidence that they had withdrawn from the conspiracy prior to the shooting. See United States v. Walker, 796 F.2d 43, 49 (4th Cir. 1986) (noting that conspirators are deemed to continue as members of conspiracy absent affirmative evidence of termination of or withdrawal from conspiracy). Therefore, there was also no abuse of discretion in admitting the shooting evidence against Womack and Lipford. To the extent that Womack and Lipford assert that they were entitled to a limiting instruction under Federal Rule of Evidence 105, **9** that claim fails for the same reason.

Because the shooting evidence had an established nexus to the drug conspiracy, that evidence was intrinsic and highly relevant to the drug trafficking conspiracy charge. We therefore affirm, in all respects, its admission by the district court.

_____

**9** Rule 105 provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." See Fed. R. Evid. 105.

14

B.

Farmer also claims reversible error in the denial of his motion to suppress evidence seized during the execution of the search warrant on November 21, 1996. He challenges the denial of suppression on three grounds, arguing that the motion should have been granted because: (1) the search warrant was not supported by probable cause; (2) the search warrant for his home was not signed by the Magistrate; and (3) the police officers did not meet their obligation to "knock and announce" before entering. For the reasons explained below, we find each of these claims unavailing.

1.

First, Farmer claims that the search warrant itself was not supported by probable cause. We are compelled to reject this argument. Farmer clearly waived it in the district court when he agreed that his motion to suppress was based <u>not</u> on a challenge to probable cause but rather upon a violation of the "knock and announce" rule. J.A. 70. Further, we have carefully reviewed the evidence supporting the warrant, and we are confident that the warrant was supported by probable cause.

2.

Farmer also contends that before the police began searching his home, they handed him a copy of the search warrant that did not bear the Magistrate's signature. Farmer asserts that this fact -- that his copy of the warrant was unsigned -- mandates suppression of the evidence gathered during the search. Farmer did not contend at the suppression hearing that the warrant was actually unsupported by probable cause; rather, he asserted that delivery of an unsigned copy was an independent constitutional violation.

Presuming that Farmer is correct that some copies of the warrant were signed but that his was not, this was, at most, a technical violation of Federal Rule of Criminal Procedure 41(d), and not a violation of the Fourth Amendment. Absent a demonstration of prejudice or bad faith -- neither of which is present here-- suppression of evi-

15

dence is not the proper remedy for a violation of Rule 41(d). See United States v. Marx, 635 F.2d 436, 441 (5th Cir. 1981) ("Violations of Rule 41(d) are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith."). Because Farmer has neither alleged bad faith nor made a showing of prejudice, we affirm the district court on this issue.

3.

Finally, with respect to compliance with the "knock and announce" rule, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Ward, 171 F.3d 188, 193 (4th Cir. 1999). Further, we measure the period between "knock and announce" and forcible entry for reasonableness in light of the case's particular facts. Id. at 194-95. In this regard, we consider the totality of the circumstances.

Here, the district court found that the officers had identified themselves prior to entering Farmer's home, and also that evidence potentially could have been destroyed absent immediate entry into Farmer's home. Although the court made no specific findings on the other evidence submitted at the suppression hearing in connection with this argument, that evidence indicates that the officers had additional relevant facts before them when they entered Farmer's home. Before entering, a group of officers gathered around Farmer's home with a search warrant and with reliable information that the home was being used for drug trafficking. Then, one undercover officer approached the home and knocked on the door, posing as a drug buyer. Farmer answered her knock immediately but told her to leave. As the officer walked away, she signaled for the search team to enter. They approached the door, knocked, and announced that they were police officers. The officers waited approximately five seconds and, hearing no response (as opposed to the immediate response received by the undercover officer), the officers broke into the home using a battering ram.

Evaluating the totality of these circumstances, we agree with the district court that it was objectively reasonable for the officers to enter approximately five seconds after they knocked and announced. We

16

find no clear error in the district court's determination that evidence was in danger of being destroyed, and the other facts known to the officers -- especially that a knock on the door had been acknowledged very quickly just a few minutes earlier -- convince us that the contested actions of the officers were objectively reasonable.

We therefore find no reversible error in Farmer's challenges to the denial of his motion to suppress the fruits of the November 21, 1996 search of his home, and we sustain the rulings of the district court in this regard.**10**

IV.

Womack, Farmer, and Lipford have also challenged their sentences on various grounds. For the reasons below, we affirm the sentences of Womack and Farmer but vacate Lipford's sentences.

A.

Womack has a single objection to his sentencing. He claims that the trial court erred in departing upward based on his prior convictions, asserting that the United States Attorney failed to file with the court, and properly serve, the information required by 21 U.S.C. § 851(a)(1).**11** Because Womack did not properly preserve this argu-

_____

**10** We have also carefully considered the appellants' other challenges to the guilt phase below, including: (1) that the "law of the case" doctrine prohibited admission of the shooting evidence; (2) that the Government should have been prohibited from submitting the shooting evidence to the jury in the order that it was admitted; and (3) that there was insufficient evidence to support their drug conspiracy convictions. We find each of these arguments to be without merit. Similarly, we find no basis on this record to conclude that Womack's counsel was ineffective, although Womack may seek to pursue that argument in a collateral proceeding.

**11** 21 U.S.C. § 851(a) requires, in pertinent part:

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

17

ment below, we must review this assertion for plain error. See United States v. Olano, 507 U.S. 725 (1993); United States v. Ford, 88 F.3d 1350, 1355 (4th Cir. 1996) ("A defendant's failure to object to a sentencing issue amounts to a waiver of his right to raise that issue on appeal, absent plain error."). To meet this "plain error" standard, Olano requires: (1) that there be error; (2) that the error be plain; (3) that the plain error affected the defendant's substantial rights; and (4) that the plain error seriously affected the fairness, integrity, or public reputation of judicial proceedings. See Olano , 507 U.S. at 732-36.

On this record, we fail to find error in the district court's upward departure. The district court's criminal docket sheet for this case notes that, on June 2, 1997, the United States Attorney filed an information setting forth those of Womack's prior convictions that the Government intended to rely upon in seeking an increased sentence. The docket sheet also reveals that Womack's lawyer at that time was William C. Hicklin of Virginia. The information itself clearly informed the district court that the Government was seeking "increased punishment by reason of prior convictions" because Womack "was found guilty in the Circuit Court for the City of Danville, Virginia, of four counts of distribution of cocaine on May 5, 1994." See Second Supp. J.A. 1. Further, attached to the information is a certification by an Assistant United States Attorney that the information was hand-delivered to Mr. Hicklin on June 2, 1997. Id.  at 2. Finally, Mr. Hicklin, who represented Womack through sentencing, did not object to the upward departure by arguing that the Government failed to serve the information; rather, Womack's new lawyer on appeal identified this claim of error based on an incomplete criminal docket sheet that did not contain the entry recording the Government's filing of the information. Given this evidence, and the lack of any evidence to the contrary, we find no error in the upward departure based on Womack's prior convictions.

B.

1.

Farmer also challenges his sentence on several grounds. He first contends that the district court erred in calculating the weight of drugs that correlated to his base offense level. We review the district court's

18

factual findings on the weight of the drugs for clear error. United States v. Randall, 171 F.3d 195, 210 (4th Cir. 1999). "Further, the district court may attribute to the defendant the total amount of drugs involved in the conspiracy, provided the drug quantities were reasonably foreseeable to the defendant and are within the scope of the [conspiracy]." Id. (citing United States v. Irvin, 2 F.3d 72, 77 (4th Cir. 1993)). Moreover, the Government need only prove the drug quantities attributable to the defendant by a preponderance of the evidence. See United States v. Vinson, 886 F.2d 740, 741-42 (4th Cir. 1989).

Here, the district court gave Farmer a life sentence based on an adjusted offense level of 47 (increased from a base offense level of 38). To reach a base offense level of 38 under United States Sentencing Commission, Guidelines Manual, § 2D1.1 (Nov. 1998) ("USSG"), the district court had to find that Farmer was involved in the distribution of only 1.5 kilograms of crack. However, the district court found Farmer responsible for over 5 kilograms of crack, and Farmer concedes that at least one witness testified to Farmer's direct involvement in the distribution of this amount. Farmer's sole argument is that this testimony was not credible. On the contrary, we find no clear error and affirm the district court's finding.

2.

Farmer next claims error in the two-level increase based on his possession of a firearm in connection with a drug offense. See USSG § 2D1.1(b)(1). The district court made that finding based on Farmer's shooting of the police officer during the execution of the search warrant, but Farmer claims that this increase was erroneous because there were no drugs found at Farmer's residence that night. In light of Burton's testimony establishing a nexus between the shooting and the drug conspiracy, see supra at 7, we find no error in the district court's determination that Farmer's possession of the firearm was connected to a drug offense. Farmer's argument in this respect thus fails.**12**

_____

**12** For this same reason, Farmer's challenge to the three-point "official victim" increase for shooting a police officer, see USSG § 3A1.2, also fails.

3.

Farmer next claims error based on the district court's two-level increase for Farmer's role in the offense under USSG§ 3B1.1: that Farmer was an organizer, leader, manager, or supervisor in the drug conspiracy. The district court's factual determinations on role in the offense are reviewed for clear error. See United States v. Sarno, 24 F.3d 618, 622-23 (4th Cir. 1994); United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989). Although Farmer states, in conclusory fashion, that there was no evidence to support this finding, we conclude that there was ample evidence supporting this determination, and we certainly find no clear error.**13** We therefore reject this argument.

4.

Finally, Farmer contends that the district court erred in increasing his offense level by two-levels based on "obstruction of justice" under USSG § 3C1.1. Farmer asserts that this increase was not justified because he was attempting to procure an unsworn false statement, not a sworn false statement.**14** The district court concluded that an obstruction of justice increase was justified based either upon: (1) "the allegations of perjury" or (2) Farmer's attempt "to get the false affidavits executed, or in fact getting false affidavits executed." J.A. 1955-56. Farmer now asserts that this was not an obstruction of justice because the document he sent to Hood would not have been a sworn statement even if it had been signed.

_____

**13** Indeed, the district court considered a two-point increase "conservative[,]" noting that the evidence supporting Farmer's role in the offense could have justified "a four[-point increase] rather than a two[-point increase]." J.A. 1955.

**14** Although it is unclear which particular conduct the district court relied upon in imposing this increase under USSG§ 3C1.1, we believe the district court likely grounded this increase on Farmer's attempt to get a false written statement from Anthony Hood. Among other things, Hood testified that, prior to trial, Farmer sent him a document stating -- untruthfully -- that Hood did not know, or have any dealings with, Farmer. Farmer asked Hood to sign it (without swearing to it), but Hood declined.

We note that the Sentencing Guidelines broadly define the conduct constituting an obstruction of justice under USSG§ 3C1.1.[15] However, we need not decide whether the conduct here meets that broad definition because even if we assume, without deciding, that there was error, any such error would be harmless. Farmer was sentenced to life imprisonment based on an adjusted offense level of 47, but absent other considerations not present here, an adjusted offense level as low as 43 would have left the district court with no choice other than the imposition of a life sentence. Because Farmer received only an additional two-level increase for this conduct, we need not decide whether attempting to procure a false, unsworn statement -- as opposed to a false, sworn statement -- may merit an enhancement for obstruction of justice under USSG § 3C1.1.

We therefore affirm Farmer's sentence to life imprisonment.

C.

Lipford was sentenced to 168 months in prison based on an adjusted offense level of 34. In adjusting Lipford's base offense level, the district court increased, by two levels, his combined[16] base offense level after finding that Lipford possessed a firearm during the drug conspiracy. However, two circumstances require us to vacate Lipford's sentence. First, we have reinstated Lipford's§ 924(c)(1) conviction, which was based on carrying a firearm during and in relation to a drug transaction on May 31, 1996. Second, under certain conditions, the Sentencing Guidelines prohibit an increase in base offense level for possession of a firearm if the same conduct served as the basis for a conviction under 18 U.S.C. § 924(c)(1). See USSG

_____

[15] At the time that Farmer was sentenced, USSG § 3C1.1 provided: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." See USSG § 3C1.1.

[16] Pursuant to USSG § 3D1.5, the base offense levels of Lipford's six convictions were combined to determine the appropriate sentence. The district court's final judgment then provided 168 months imprisonment "[o]n Counts 1, 10, 39, 40, 41, and 43, all such terms to run concurrently with each other." J.A. 1916.

21

§ 2K2.4 comment(n.2). The record is sufficiently ambiguous[17] that the district court could have relied upon the same conduct underlying the § 924(c)(1) conviction when it increased Lipford's base offense level. We are thus compelled to vacate each of Lipford's sentences. On remand, the district court should determine: (1) Lipford's sentence for the § 924(c)(1) conviction; and (2) whether the increase under USSG § 2D1.1(b)(1) is warranted in light of the§ 924(c)(1) conviction and sentence thereunder.

V.

Pursuant to the foregoing, we reverse the district court's judgment of acquittal on Lipford's conviction under 18 U.S.C.§ 924(c)(1) and direct entry of a judgment of conviction on that count. We remand for resentencing of Lipford and for such other proceedings as may be

_____

[17] The district court seemingly relied upon the May 31, 1996 conduct for the two-level increase when it noted that there is a more relaxed nexus requirement underlying USSG § 2D1.1(b)(1) than that required by § 924(c)(1): "Under the guidelines I don't think there is the same type nexus required between the drug offense and the possession of the firearm." J.A. 1905. However, the court did not necessarily rely only upon that conduct; rather, it also made the following observations:

> [O]bviously we had one shooting, we had Mr. Farmer shooting, which is not tied to the defendant particularly, but it's -- we had guns playing throughout the whole of the [conspiracy].
>
> This particular tying of the gun to Mr. Lipford is not dependent upon the specific count but is dependent upon all the counts, including count one. So I think there is sufficient proof that, yes, he . . . had a gun. He possessed a gun. There's no question about that, and I don't think it is clearly improbable that the gun lacked a connection with the offense.

J.A. 1905-06. By "[t]his particular," the court was likely referring to the generalized tying, in Lipford's presentence report, of a firearm to the conspiracy. Nonetheless, because the court also referred to the possession of the firearm during the drug transaction on May 31, 1996, the district court may have been relying upon that conduct when it increased Lipford's base offense level.

22

appropriate. In all other respects, we affirm the convictions and sentences of the appellants.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED FOR FURTHER PROCEEDINGS

23